UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

TRAVEL SENTRY, INC.,

                       Plaintiff,

      -against-

DAVID A. TROPP,

                    Defendant.

------------------------------------------------------------------x

MEMORANDUM AND ORDER

06-CV-6415 (ENV)

VITALIANO, D.J.

      On December 4, 2006, plaintiff Travel Sentry, Inc. ("Travel Sentry") commenced a declaratory action against defendant David Tropp ("Tropp") to invalidate two of Tropp's patents and, consequently, to find Travel Sentry non-liable for their infringement.[1] Tropp seeks validation and an injunction against further infringement. A hearing was held pursuant to Markman v. Westview Instruments, Inc., 517 U.S. 370, 373 (1996) on December 16, 2008 to address the proposed construction of claims.

## I.     BACKGROUND

      Tropp owns the two patents at issue in this action: (1) United States Patent No. 7,021,537, filed November 12, 2003, and issued April 4, 2006 [hereinafter "537 patent"] and (2) United States Patent No. 7,036,728, filed November 12, 2004 and issued May 2, 2006 [hereinafter "728 patent"]. The 728 patent claims priority from and is a continuation in part of the 537 patent. Both patents are entitled

---

[1]   Travel Sentry originally filed suit against Tropp and his company, Safe Skies, in the United States District Court for the District of New Hampshire. That suit was dismissed for lack of subject matter jurisdiction and against Tropp for lack of personal jurisdiction. Travel Sentry, Inc. v. Tropp, No. 06-CV-118, 2006 WL 3478997, at *5-6 (D.N.H. Dec. 1, 2006). An earlier New York action, Travel Sentry, Inc. v. Tropp, et al., No. 05-cv-2338 (E.D.N.Y.), was also initiated by Travel Sentry asserting claims of unfair competition and defamation; counterclaims for misappropriation of trade secrets and unjust enrichment were interposed. That case ultimately settled.

"Method of Improving Airline Luggage Inspection" and describe a method of airline luggage screening via a dual-access luggage lock system. By making use of a special lock, an owner can secure his luggage while also giving a screening entity, such as the Transportation Security Administration (TSA), access to the luggage without clipping the lock or damaging the luggage. Travel Sentry is involved in developing a similar locking program. In fact, John Vermilye, Travel Sentry's CEO and founder, was a TSA consultant who worked on designing and implementing the TSA's luggage screening program in 2002.

## II.    DISCUSSION

### A.    Standards Governing Claim Construction

The construction of a patent, including the terms of art within a claim, is a question of law for the court. Markman v. Westview Instruments, Inc., 517 U.S. 370, 373 (1996). The construing court looks first to the intrinsic evidence – the patent and its claims, its specification,[2] and the prosecution history if available. See Vitronics Corp. v. Conceptronic, Inc. 90 F.3d 1576 (Fed. Cir. 1996).

Claim construction begins with the claims themselves since they define the scope of the patented invention. Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005)(en banc); see also Corning Glass Works v. Sumitomo Elec. U.S.A., Inc., 868 F.2d 1251, 1257 (Fed. Cir. 1989)(the claims determine "the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention"). But, because claims "are part of a 'fully integrated writing instrument,'" Phillips, 415 F.3d at 1315 (citing Markman, 52 F.3d at 978, aff'd, 517 U.S. 370 (1996)), claim terms are considered in the context of the patent as a whole, including the specification as well as the other claims. Id. (citing Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1477 (Fed. Cir. 1998); see also ACTV, Inc. v. Walt Disney Co., 346

---

[2]    "Specification" and "written description" are used interchangeably in this opinion.

2

F.3d 1082, 1088 (Fed. Cir. 2003)(surrounding words in claim are also considered in determining the ordinary and customary meaning of disputed terms). Though the plain and ordinary meanings of claim words are presumed, an inventor can act as his own lexicographer and assign a different meaning to those words, so long as they are clearly and deliberately stated in the patent or the prosecution history. Phillips, 415 F.3d at 1316. Additionally, if applying the ordinary meaning of a term would create ambiguity or confusion in a claim, a court can look to other intrinsic evidence (or, if necessary, extrinsic evidence) to ascertain the proper meaning; however, a party advocating an alternative reading of an otherwise clear claim term must show why the ordinary meaning is not the appropriate interpretation. Robert L. Harmon, Patents and the Federal Circuit 302 § 6.2 (8th ed. 2007).

Although intrinsic evidence is the most important source for disputed meanings of a claim, a court can consider extrinsic evidence, including expert and inventor testimony, dictionaries, and learned treatises, when appropriate. Markman, 52 F.3d at 980. But, there is a caution—extrinsic evidence is used only "if needed to assist in determining the meaning or scope of technical terms in the claims". Id. Such evidence is considered less reliable than intrinsic evidence, though dictionaries and related sources can often aid the court in understanding a word's ordinary meaning as understood by those skilled in the art at the time of the patent's prosecution. Phillips, 415 F.3d. at 1318, 1321-23.

In constructing claims, a court can use its discretion to cabin its consideration to only those issues that "cut to the heart of the matter"—in other words, a court need not construe all claims proposed by the parties, but limit construction to those claims which may prove dispositive. O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1362 (Fed. Cir. 2008). Nonetheless, if there is "a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." Id.

## B.      CONSTRUCTION OF DISPUTED TERMS

3

The parties have offered the following proposed terms for construction: (1) master key, (2) identification structure, (3) baggage screening entity, (4) baggage screener, (5) making available to consumers a special lock, (6) prior agreement, (7) special procedure and, (8) marketing. Unless otherwise demonstrated, the Court presumes that claim terms appearing in the same patent or in related patents contain the same construed meaning. See, e.g., Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1334 (Fed. Cir. 2003).

The 537 patent contains four independent claims. Claim 1 of the 537 patent recites:

1. A method of improving airline luggage inspection by a luggage screening entity, comprising:

> making available to consumers a special lock having a combination lock portion and a master key lock portion, the master key lock portion for receiving a master key that can open the master key lock portion of this special lock, the special lock designed to be applied to an individual piece of airline luggage, the special lock also having an identification structure associated therewith that matches an identification structure previously provided to the luggage screening entity, which special lock the luggage screening entity has agreed to process in accordance with a special procedure,

> marketing the special lock to the consumers in a manner that conveys to the consumers that the special lock will be subjected by the luggage screening entity to the special procedure,

> the identification structure signaling to a luggage screener of the luggage screening entity who is screening luggage that the luggage screening entity has agreed to subject the special lock associated with the identification structure to the special procedure and that the luggage screening entity has a master key that opens the special lock, and

> the luggage screening entity acting pursuant to a prior agreement to look for the identification structure while screening luggage and, upon finding said identification structure on an individual piece of luggage, to use the master key previously provided to the luggage screening entity to, if necessary, open the individual piece of luggage.

Independent claim 9 of the same patent has identical language to claim 1, but substitutes "combination lock portion" with the term "first lock portion" and contemplates a method where the identification structure is located directly on the lock. Claims 14 and 18 also contain identical language to claim 1, but contemplate a method where the identification structure is "integrally formed" with the lock.

4

The 728 patent contains two independent claims. Claim 1 of the 728 patent recites:

1. A method of improving carrier baggage inspection by a baggage screening entity, comprising:

> making available to consumers a special lock, having a combination lock portion and having a master key lock portion, the master key lock portion for receiving a master key that can open the master key lock portion of this special lock, the special lock designed to be applied to an individual piece of carrier baggage, the special lock also having an identification structure associated therewith that matches a corresponding identification structure previously provided to the baggage screening entity, which special lock the baggage screening entity has agreed to process in accordance with a special procedure,

> marketing the special lock to the consumers in a manner that conveys to the consumers that the special lock will be subjected by the baggage screening entity to the special procedure,

> the identification structure signaling to a baggage screener of the baggage screening entity that the baggage screening entity has agreed to subject the special lock associated with the identification structure to the special procedure, and

> the baggage screening entity acting pursuant to a prior agreement to look for the identification structure while screening baggage and, upon finding said identification structure on an individual piece of baggage, to use the special procedure previously agreed to by the baggage screening entity to, if necessary, open the individual piece of baggage.

Claim 10 contains identical language as claim 1, but substitutes the combination lock portion covered in claim 1 with a "first lock portion".

1. "MASTER KEY"

The term "master key" appears in both the 537 and the 728 patents. Claim 1 of the 537 patent claims, in relevant part, a method of improving airline luggage screening comprising: "making available to consumers a special lock having a combination lock portion and a master key lock portion, the master key lock portion for receiving a master key that can open the master key lock portion of this special lock..." Claim 1 of the 728 patent claims, in relevant part, a method of improving carrier baggage inspection comprising: "making available to consumers a special lock, having a combination

lock portion and having a master key lock portion, the master key lock portion for receiving a master key that can open the master key lock portion of this special lock…"

Tropp's construction of "master key" is a simple one. He suggests that "master key" is "a key that can open multiple locks, citing the <u>American Heritage College Dictionary</u>, which defines the term "master key" as "[a] key that opens each of a given set of locks." (Def.'s Ex. 5). Travel Sentry's proposed construction of the same term is a "single key or electronic sensor mechanism having the ability to open a dedicated key lock portion of multiple different locks."

In advancing this definition, Travel Sentry argues that there are "no material differences" between the two constructions, but for the inclusion of electronic sensor mechanisms. Tropp disagrees. Specifically, he objects to limiting "master key" to a "single key" since the written description allows for multiple master keys to be held by baggage screening officials, and because "the significant characteristic of a master key is that it can open each of a given set of locks – not whether there is a *single* key or multiple keys that have that capability." (Def.'s Reply Br. 7). Tropp also argues against Travel Sentry's use of "dedicated" and the insertion of "electronic sensor mechanism" in construing "master key" since the term "key" already embodies and contemplates electronic keys and the word "dedicated" is unsupported by the patents' claims.

The Court agrees with Tropp that "master key" does not require the word "single" to make the construction clear, and accordingly, the Court declines to read this limitation into the proposed construction of "master key". On the other hand, the ordinary meaning of "master key," does not make clear that its definition includes electronic or other sensor mechanisms, as the claim language, the surrounding claims, and the specifications suggest. In any event, and critically, the patents' written descriptions clearly teach that the definition of "master key," as it is used in the patents, extends beyond its centuries-laden description, *i.e.* a metal, jagged edge object, by contemplating electronic and other sensor mechanisms within the scope of the term. See <u>Genzyme Corp. v. Transkaryotic</u>

Therapies Inc., 346 F.3d 1094, 1098 (Fed Cir. 2003)(a patentee can expand the scope of the term's generally understood meaning in the context of his claims). The specifications to the 728 and 537 patents state that "the terms 'master key' and 'master key lock portion' are broad terms intended *to also include* electronic or *other* sensor mechanisms for opening up the master key lock portion in [the special lock]" and that the "invention contemplates using in certain embodiments a special lock [] that makes use of an electronic sensor instead of a traditional physical key even though such a traditional physical key is typically understood by the term 'master key. In such a case the locking mechanism inside [the] special lock [] would not be a traditional master key lock mechanism but rather would be a locking mechanism that is opened by an electronic sensor." 537 patent, col.5, ll.41-52; 728 patent, col. 6, ll. 66-67, col. 7, ll. 1-10 (emphasis added). In urging the Court to incorporate "electronic sensor mechanism" in its proposed construction, Travel Sentry similarly points to this same language, contrasting it with the term's plain meaning, which, as evidenced by a dictionary definition, has described "master key" as "a key designed to open several different locks". Merriam-Webster's Collegiate Dictionary 764 (11th ed. 2006).

While it is clear that the specifications expand the ordinary and plain meaning of "master key" to include electronic and other sensor mechanisms, see Phillips, 415 F.3d at 1316 ("the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess...in such cases, the inventor's lexicography governs."), limiting "master key" to "a single key or electronic sensor mechanism" appears overly restrictive since the patent clearly contemplates other kinds of mechanisms that may also qualify as a "master key", and, as the specifications to both patents teach— "master key" is meant to be broadly construed.

Travel Sentry's argument that the key lock portion is "dedicated" is also unduly limiting in light of the specifications of the patents-in-suit. In describing the interaction of the master key with the master key lock portion of the special lock, the specifications state that when an electronic or other

sensor mechanism is used to open up the master key lock portion of the special lock, that locking mechanism would not be a traditional master key lock mechanism but a locking mechanism opened by an electronic sensor. The language of the claims does not support a limitation that the locking mechanism or master key lock portion, electronic or otherwise, be "dedicated". When a patent's specification does not provide for the proffered restriction stated in the proposed construction, that limitation should not be then read into the claim terms. Teleflex, Inc. v. Ficosa North Am. Corp., 299 F.3d 1313, 1327 (2002) (claim terms take their ordinary and accustomed meanings unless the patentee shows an intent to deviate from them, or by using words of manifest exclusion or restriction, clearly disavows a claim's scope). Indeed, under a fair reading of the specifications to both patents, it is contemplated that sensor mechanisms would not have a *dedicated* key lock portion. Instead, the patents' written descriptions focus on the interaction between the "master key" (in its traditional physical incarnation or otherwise) and the locking mechanism, which *may include* (but is not limited to) a dedicated key lock portion.

Therefore, in light of the patents' written descriptions, the Court construes the claim term "master key" in the 728 and 537 patents to be a key, including electronic or other sensor mechanisms, that can open the master key lock portion or locking mechanisms of the special locks described in the patent.

## 2. "IDENTIFICATION STRUCTURE"

The term "identification structure" appears in independent claims 1,9,14, and 18 of the 537 patent and independent claims 1 and 10 of the 728 patent. Claim 1 of the 537 patent states that:

> the special lock [would have an] identification structure associated therewith that matches an identification structure previously provided to the luggage screening entity, which special lock the luggage screening entity has agreed to process in accordance with a special procedure... the identification structure signaling to a luggage screener of the luggage screening entity who is screening luggage that the luggage screening entity has agreed to subject the special lock associated with the

> identification structure to the special procedure...the luggage screening entity acting pursuant to a prior agreement to look for the identification structure while screening luggage and, upon finding said identification structure on an individual piece of luggage, to use the master key previously provided [to open the luggage].

537 patent, col. 6, ll. 14-19, 23-29 & 31-37. Claims 4 and 6, dependent to claim 1, contemplate the identification structure being located directly or formed integrally with the special lock. Claim 9 is nearly identical to claim 1 but the special lock would have a first lock as opposed to a combination lock (covered by claim 1). Claim 14 and dependent claim 15 contemplate a special lock with a combination lock portion and a master key lock portion, where the identification structure is integrally formed with the special lock, while claim 18 covers the same scope as claim 14 but contemplates a special lock with a first lock portion and a master lock portion. Claim 1 of the 728 patent, with respect to the term "identification structure" in sum and substance resembles claim 1 of the 537 patent, but replaces references to "airline luggage," "airline luggage inspection," "luggage screener," and "luggage screening entity" with "carrier baggage inspection", "baggage screening entity", and "baggage screener". Similarly, as with the 537 patent, claims 4 and 5, dependent to claim 1, contemplate the identification structure described in claim 1 as being integrally formed with the special lock where the signaling from the identification structure is visual. Claim 10 of the 728 patent resembles claim 1 in sum and substance but contemplates a first lock portion as opposed to a combination lock portion.

Tropp's proposed construction for identification structure is "indicia associated with a lock that signals to a luggage or baggage screener that the lock is subject to a special screening procedure." Travel Sentry's proposed claim construction for "identification structure" is "an indicia such as a marking, stamping, etching, casting, molding, labeling, inscribing of an alphanumeric symbol, logo, or other distinctive marking." Tropp contends that Travel Sentry's proposed construction only provides examples of indicia but does nothing to further construction of the term "identification structure".

9

(Def.'s Br. 9). Travel Sentry acknowledges that the term "indicia" is a broad term and argues that the specifications use the term "indicia" in referring to the identification structure but does not otherwise distinguish its definition from Tropp's beyond asserting that Tropp's proposed construction is "imprecise, circular, and inappropriately vague." (Pl.'s Br. 8).

The claim language in both the 728 and 537 patents contemplate that "identification structure" is broader than the examples offered by Travel Sentry. The patents-in-suit provide for embodiments where the identification structure may be "located directly" on the special lock, or "integrally formed" with it. The claims do not support limiting identification structure to "an indicia such as a marking, stamping, etching, casting, molding, labeling, inscribing of an alphanumeric symbol, logo, or other distinctive marking." The specification to the 728 patent states that "indicia" is a "broad term and can also include the special lock itself...a distinctive physical characteristic such shape, texture, weight and/or other characteristic such as color, that makes it instantly recognizable by individuals... [a]lternatively, a distinctive chemical or electronic characteristic can be used – in short, any distinctive characteristic that can be instantly recognized by persons looking for it." 728 patent, col.4, ll. 44-55. The 537 patent also supports a broad reading of the identification structure. 537 patent, col. 4, ll. 1-16, col. 5, 24-31.

The specifications, therefore, do not support reading Travel Sentry's proposed limitations into the claim terms. See Specialty Composites v. Cabot Corp., 845 F.2d 981, 987 (Fed. Cir. 1988). Read in light of the specifications, the claims clearly contemplate that the identification structure may be associated with a lock (e.g., on a tag near the lock), on the lock, or the identification structure can even be the lock itself. The examples enumerated by Travel Sentry in its definition do not appear in the claims nor are they even acknowledged in the patents' specifications. Accordingly, the Court finds that grafting these examples onto the definition serves no purpose and would, in any event, be misleading. To that end, the Court adopts Tropp's construction and construes "identification structure"

as indicia associated with a lock that signals to a luggage or baggage screener that the lock is subject to a special screening procedure."

### 3. "BAGGAGE SCREENER" AND "BAGGAGE SCREENING ENTITY"

Tropp's proposed construction for baggage screening entity is "an entity that screens baggage". Travel Sentry's proposed construction is "[a]ny governmental agency or non-governmental organization that screens or inspects luggage prior to being loaded aboard aircraft." Similarly, Tropp defines baggage screener as "a person who screens baggage" while Travel Sentry defines the term as "[a]ny person employed by a governmental agency or non-governmental organization that screens and inspects luggage prior to being loaded abroad aircraft."

The terms "baggage screener" and "baggage screening entity" appear in independent claims 1 and 10 of the 728 patent. While Tropp, unsurprisingly, takes issue with nearly every aspect of Travel Sentry's proposed construction of "baggage screener" and "baggage screening entity", the conflict between Tropp's and Travel Sentry's proposed constructions of "baggage screener" and "baggage screening entity" centers materially on three issues: (1) whether luggage and baggage are synonyms, (2) whether the screening is limited in scope to screening done in connection with air travel only, and (3) whether it should be further confined to screening that occurs prior to the baggage being boarded onto aircraft.

#### a. Whether baggage is synonymous with luggage

The words "luggage" and "baggage" appear in both patents. The 728 patent claims "a method of improving carrier baggage inspection by a baggage screening entity" and replaces all references to "luggage" and "luggage screening entity" in the 537 patent to "baggage" and "baggage screening entity" in the 728 patent. However, while the claims in the 728 patent use the word "baggage", the term "luggage" appears predominantly in the specifications of both patents, and both patents are titled

11

"Method of Improving Airline Luggage Inspection".

The 728 patent is a continuation-in-part from the 537 patent. The written descriptions of the 728 and the 537 patents are identical in their treatment of "baggage", although the word appears sparsely in them. The "background of the invention and discussion of the prior art" sections of the 728 and 537 patents state that "[d]ue to the threat of terrorism... the TSA... announced that with respect to luggage at United States airports if a TSA baggage screener was unable to open a traveler's bag for inspection because the bag was locked, the screener would have to break the locks on the traveler's bag. Hence, travelers should leave their bags unlocked...[b]eginning Jan. 1, 2003 the TSA's federal workers started screening luggage at U.S. airports and when it deemed it necessary it started clipping locks on this luggage in order to open and inspect the luggage. 537 patent, col. 1, ll. 13-25. "[T]ravelers, just getting accustomed to the new security laws, may have legitimate concerns about baggage inspections...[i]n addition, working as a TSA luggage screener is a highly demanding and stressful job. 537 patent, col. 2, ll. 8-14. Stated differently, there is no indication from the patent's specifications or the prosecution history of either patent[3] that a person of ordinary skill in the art considers "baggage" as covering a different scope than luggage. It appears that both patents use the word "baggage" synonymously with "luggage" which impels the Court to conclude that "baggage" is not ascribed a different meaning from "luggage" within the context of the claims.

Additionally, the prosecution history for the 728 patent suggests that the word "luggage screening authority" was changed to "baggage screening entity" to "broaden it" to indicate that the term extended to nongovernment entities, but there is no similar argument or remarks made by Tropp indicating that "baggage" should be, and was intended to be given a different meaning from "luggage"

---

[3]   Interpretations made in the prosecution of a parent application can also affect related continuation in part applications arising from that same patent. See, e.g., Omega Eng'g v. Raytek Corp., 334 F.3d 1314, 1333-34 (Fed. Cir. 2003).

(Def.'s Reply Br. Attach.).[4]  Accordingly, "baggage screener" and "baggage screening entity" in the

728 patent are synonymous with "luggage screener" and "luggage screening entity" as used in the 537

patent.

### b.  Scope of baggage screening

Travel Sentry argues further that "baggage screener" and "baggage screening entity" should be

limited to screenings related to air travel only.  This Court agrees.  The claim terms of the patents and

their written descriptions focus solely on the method's usefulness and applicability for improving air

travel screening procedures.  When the inventor acts as his own lexicographer, he controls how

expansive or narrow the scope of his definition should be, though this asserted definition must be

supported by the specification.  See Jonsson v. Stanley Works, 903 F.2d 812, 819 (2d Cir. 1990).

Independent claims 1,9,14, and 18 in the 537 patent claim "a method of improving airline

luggage inspection by a luggage screening entity".  Independent claims 1 and 10 in the 728 patent

claim "a method of improving carrier baggage inspection by a baggage screening entity", but the

language in the 728 patent's specification is nearly identical to the 537 patent with respect to the

invention's objectives and benefits.  Thus, the specifications for both patents clearly support a finding

that the field of the invention extends to air-related travel only.  See, e.g., SciMed Life Sys. Inc. v.

Advanced Cardiovascular Sys. Inc., 242 F.3d 1337 (Fed Cir. 2001) ("Where the specification makes

clear that the invention does not include a particular feature, that feature is deemed to be outside the

reach of the claims of the patent, even though the language of the claims, read without reference to the

specification, might be considered broad enough to encompass the feature in question.").

The patents-in-suit are entitled "Method of Improving Airline Luggage Inspection".  In

---

[4]  Reading "baggage" and "luggage" as synonyms is supported not only by the specifications, but also by the
fact that the plain meaning of the words themselves are consistent with the patents' written descriptions.
Webster's Third New International Dictionary ("Webster's") defines both luggage and baggage as
synonyms of the other.  Webster's at 162, 1344 (2002).  Oxford American Dictionary ("Oxford") defines
baggage as a synonym for luggage.  Oxford. at 121 (2001).

describing the field of the invention, both patents state that "[t]he field of this invention is methods of improving *airline* luggage inspection, and more particularly, methods of making such inspection less intrusive and more secure"). 537 patent, col. 1, ll. 6-8; 728 patent, col. 1, ll. 20-22. Furthermore, the specifications in both patents identically extol the benefits of the invention to air-travelers and airport screeners and are replete with references to screening procedures and problems unique to air travel. For example, the patents discuss the benefits of the invention, which include addressing the concerns of "close to half a billion" airline travelers who pass through airports in the United States. 537 patent, col. 2, ll. 17-20; 728 patent, col. 2, ll. 33-37. The patents also state that "there is a compelling and immediate need for a method of inspecting luggage at airports that does not create a security risk and that is not damaging or aggravating to passengers." 537 patent, col. 2, ll. 21-24; 728 patent, col. 2, ll. 38-41. The laundry list of important objects and advantages of the invention focus entirely on its usefulness in screening luggage at airports, *i.e.* to provide a method of screening "at *airports* that avoids forcible opening of luggage"; to "non-intrusively search[] passenger's luggage at *airports*", to provide a method of "*airport* luggage screening that allows the luggage screening authority to get its work done more efficiently." 537 patent, col. 2, col. 2, ll. 55-56, 60-61, 30-32; 728 patent, col. 3, ll. 5-6, 10-11, 48-50. However, notably absent from the patents' written descriptions is any discussion of screening procedures for methods outside of the air travel context; the specifications do not even imply that the procedures covered in the patents extend beyond that scope. The short of it is that both patents focus unequivocally and exclusively on the use of the invention in improving screening procedures related to air travel.

While an inventor's anticipation that an invention would be used in a particular way does not always mean that the patent's scope is applied only in that context, see Northrop Grumman Corp. v. Intel Corp., 325 F.3d 1346 (Fed Cir. 2003), it is both permissible and proper to limit the claims when a patent, read as a whole, makes clear that the claimed invention is actually narrower than the claim

14

language implies. See Alloc, Inc. v. ITC, 342 F.3d 1361, 1370 (2d Cir. 2003). The Court need not go even that far. Here, the patents-in-suit as a whole support a construction that the terms "baggage screener" and "baggage screening entity" describe those screening procedures that take place solely in relation to air travel.[5]

Travel Sentry also argues that such screening procedures should be further limited to those that occur prior to the boarding of the luggage onto aircraft. Unlike the prior limitation, this one is unsupported by the claims and the Court rejects it. The written descriptions do not specify or even imply that such screening is limited to pre-boarded luggage nor do the specifications even require that such luggage be boarded onto aircraft. The Court reaches a similar conclusion with respect to Travel Sentry's parse-out of "entity" as "a government agency or non-governmental organization" in construing the terms. Such line-drawing is, frankly, superfluous for this claim-constructing exercise. At best, the specification of either patent suggests that an entity pertains to some authority responsible for screening, but the Court does not see the utility that is (singularly) apparent to Travel Sentry in defining "entity" as a government authority or a non-government authority. More importantly, beyond burdening these terms with mere surplusage, there is no genuine dispute, no difference, between Tropp's and Travel Sentry's proposed constructions of an "entity".

Accordingly, the Court construes "baggage screener" as a person who screens baggage, and "baggage screening entity" as an "entity that screens baggage"; "baggage" is understood as a synonym for "luggage". As for the term "screening", covered is any and all screening occurring within the scope of air travel.

### 4. "MAKING AVAILABLE TO CONSUMERS A SPECIAL LOCK"

Independent claims 1 and 10 of the 728 patent recite methods for improving carrier baggage

---

[5]  While the 537 patent uses "luggage screener" and "luggage screening entity", as the Court has determined, these terms are synonymous with "baggage screener" and "baggage screening entity" as they appear in the 728 patent. Accordingly, the analysis regarding the scope of the screening methods and the finding that the patents cover screening procedures only in the context of air travel applies to both patents.

inspection including the step of: "making available to consumers a special lock." Independent claims 1, 9, 14, and 18 of the 537 patent refer, substantively, to the same step. Tropp's proposed construction of "making available to consumers a special lock" is "[c]ausing, or otherwise facilitating, a special lock to be made available to consumers." Travel Sentry proposes that the term "making available" means "[m]anufacturing, selling, offering for sale, or distributing locks."

Travel Sentry argues, essentially, that "making available to consumers a special lock" should be read and understood as making available such locks in a commercial context. (*Markman* Hr'g Tr. 7). Specifically, Travel Sentry states that "making available" should mean "manufacturing, selling, offering for sale, or distributing locks." Travel Sentry argues that the Tropp's proposed construction is vague and unsupported by the patents themselves or the prosecution histories. Tropp, for his part, argues that "making available" is plainly understood as being broader than simply "manufacturing, selling, offering for sale, or distributing locks".

The Court is in accord with Tropp that "making available" as used in the claim terms, does not restrict "making available" to "manufacturing, selling, offering for sale, or distributing locks." While claims 3 and 5 of the 537 patent, dependent to claim 1, recite that a step of making available to consumers involves "mass producing the special lock and selling the special lock to the consumers," independent claims 9, 14, and 18, which also contain the term, include no such limiting language. Furthermore, the 537 patent's specification gives no indication that "making available to consumers a special lock" is limited to the manufacture, sale, distribution, or offering for sale of the locks. The 537 patent is focused on teaching a method of improving airline luggage inspection, of which making a special lock available to airline travelers is one step to that method. 537 Patent, col. 2, ll. 28-32.

This reading is further bolstered by how the term is used in the 728 patent. See, e.g., Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1334 (Fed. Cir. 2003)(presumption that claim terms appearing in related patents contain the same construed meaning). Dependent claims 3, 7, 8, 9, 12, 18,

19 and 20 of the 728 patent demonstrate that the term was meant to at *least* include methods such as selling the lock directly or indirectly, 728 patent, col. 8, ll. 7-9, mass producing the lock for ultimate provision to the consumer, id. at ll. 16-19, providing the identification structure to a third party, id. at ll. 20-23, and causing the lock having the identification structure to be made available to consumers, id. at ll. 24-27. Claims 12, 18, 19, and 20 are dependent to claim 10 and contain identical language as claims 3, 7, 8 and 9. In other words, these claims recite the method of independent claims 1 and 10 and each adds a limitation to the term "making available to consumers a special lock." Under the doctrine of claim differentiation, there is a presumption that the independent claims in both patents are not interpreted to include the limitations of the dependent claims. While this doctrine is not a rigid rule, see. e.g., Laitram v. Morehouse Indus., 143 F.3d 1456, 1463 (Fed. Cir. 1998), there is a strong presumption that an independent claim is not restricted by the limitations found in a dependent claim, since that would render the dependent claim superfluous. Acumed LLC v. Stryker Corp., 483 F.3d 800, 806 (Fed. Cir. 2007); see also Andersen Corp. v. Fiber Composites, LLC., 474 F.3d 1361, 1369-70 (Fed. Cir. 2007); Robert L. Harmon, Patents & the Federal Circuit 390-93, § 6.7 (8th ed. 2007)("In the most specific sense, 'claim differentiation' refers to the presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim"). The Court declines to narrowly construe "making available to consumers a special lock" to "manufacturing, selling, offering for sale, or distributing locks".

Read together, the claims of both patents strongly support a construction that does not limit "making available to consumers a special lock" to manufacturing, selling, offering for sale, or distributing locks only, since they describe ways beyond those named by Travel Sentry that would constitute "making a special lock available to consumers". Furthermore, Travel Sentry has not pointed to any evidence within the patents' written descriptions nor their prosecution histories demonstrating that Tropp intended to restrict "making available to consumers a special lock" to "manufacturing,

17

selling, offering for sale, or distributing locks," as a step in teaching a method of improving airline luggage screening. Accordingly, the term should not be limited to the few particular methods enumerated by Travel Sentry. In sum, since neither the claims nor the patents' written descriptions provide a reason for limiting "making available to consumers a special lock" in the way Travel Sentry advocates, the Court construes "making available to consumers a special lock" as "causing the special lock to be available to consumers".

### 5. "PRIOR AGREEMENT"

Travel Sentry proposes that "prior agreement" be defined as an "an agreement that is binding and enforceable by law between the baggage screening entity and another party to process locks pursuant to the special procedure." Tropp advances an alternative definition: "a prior arrangement between the luggage or baggage screening entity and another party to process special locks in accordance with a special procedure."

The term "prior agreement" appears in claims 1,9,14, and 18 of the 537 patent and claims 1 and 10 of the 728 patent. The dispute over whether the term "baggage" should be construed as synonymous with "luggage" having been resolved, the principal remaining difference in the parties' proposed constructions hinges on whether a prior agreement, within the meaning of the claims, must be understood as a legally binding and enforceable agreement. Essentially, Travel Sentry argues that the whole objective of the invention is defeated if the screening entity can choose whether or not to follow the agreed-upon special procedure at its own whim. (Pl.'s Br. 13).

The patent claims themselves lend no support to narrowly construing "prior agreement" as an agreement that is legally binding and enforceable by law. "Prior agreement", as reflected in the claim language of both patents, contemplates some coordination and pre-planning on the part of the screening entities regarding possession of the master keys to the special locks. That is all.

18

Additionally, the specifications of both patents fail to draw any distinctions about how formal such arrangements should be; neither party has pointed to any prosecution history supporting any such limiting distinction. Since the Court finds no need to construe "prior agreement" claustrophobically, it rejects any requirement that a "prior agreement" must be a legally binding and enforceable one. Therefore, the Court construes the term "prior agreement" as "a prior arrangement between the luggage screening entity and another party to process special locks in accordance with the special procedure."

### 6. "SPECIAL PROCEDURE"

The term "special procedure" appears in claims 1, 9, 14, and 18 of the 537 patent and claims 1 and 10 of the 728 patent. Claim 1 of the 537 patent has the relevant term at issue. It claims, in relevant part:

> a "method for improving airline luggage inspection by a luggage screening entity, comprising: making available to customers a special lock having a combination lock portion and a master key lock portion, the master key lock portion for receiving a master key that can open the master key lock portion of this special lock, the special lock designed to be applied to an individual piece of airline luggage, the special lock also having an identification structure previously provided to the luggage screening entity, which special lock the luggage screening entity has agreed to process in accordance with a special procedure.

537 patent, col. 6, ll. 6-18. Claim 1 also addresses "marketing the special lock to the consumers in a manner that conveys to the consumers that the special lock will be subjected by the luggage screening entity to the special procedure. As with the other terms, claims 9, 14, and 18, as relating to "special procedure", largely track the language in claim 1, and similarly, claims 1 and 10 of the 728 patent do so as well.

Travel Sentry's proposed construction of "special procedure" is "[a] procedure whereby a baggage screening entity has instructed baggage screeners to look for indicia on luggage locks and, upon finding the indicia, the baggage screener would, if necessary to inspect a piece of luggage, use a

single master key provided to the luggage screening entity to open the luggage lock and then relock it after inspecting the bag." Tropp proposes that "special procedure" be construed as "[a] procedure for processing 'special locks,' as recited in respective claims, in which the luggage or baggage screening entity has agreed to act pursuant to a prior agreement to look for the identification structure while screening luggage or baggage, and, upon finding said identification structure on an individual piece of luggage or baggage, to, *e.g.*, use the master key previously provided to the luggage or baggage screening entity to, if necessary, open the individual piece of luggage or baggage."

While both proposed constructions are long in verbiage, there is about a penny's worth of difference between them, if that much. Travel Sentry, in fact, concedes that its construction is not materially different from Tropp's. (*Markman* Hr'g Tr. 10). Tropp, for his part, repeats his objection to adding the word "single" before "master key", and disagrees with interpreting "special procedure" with the unsupported limitation that a screener must relock the bag after inspecting it.

Again, the Court agrees with Tropp that the claims do not support a requirement that the special procedure involves "a *single* master key" only (emphasis added). With respect to the additional step of relocking the lock after inspecting a bag— while a reasonable expectation and (presumably) desired result at the conclusion of a baggage screening process, it is, ultimately, an limitation unsupported in the claims. See Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1249 (Fed. Cir. 1998)("If we need not rely on a limitation to interpret what the patentee meant by a particular term or phrase in a claim, that limitation is 'extraneous' and cannot constrain the claim"). In both the 728 and 537 patents, the relocking of a bag is not addressed in the claims themselves nor is it mentioned in the specification of either patent. The written descriptions, in highlighting the important objectives and advantages of the invention, focuses on allowing luggage screeners to avoid damaging travelers' luggage and avoiding the hassle, labor, expense, and resulting injuries that arise from clipping locks. The "special procedure" in the patents' claims, read in light of the specifications, appears to focus on

the opening of luggage as opposed to the relocking of it.

Therefore, while Travel Sentry's position is reasonable, the Court declines to read a limitation into the term "special procedure" requiring screeners to relock the bag after an inspection. To that end, the Court, with modification, adopts the following proposed construction (particularly where Travel Sentry has acknowledged no significant difference in the two constructions) and construes "special procedure" as a procedure for processing special locks, as recited in the respective claims, in which the screening entity has agreed to act pursuant to a prior agreement to look for the identification structure while screening luggage, and, upon finding that identification structure on an individual piece of luggage, to, use the master key previously provided to the screening entity to, if necessary, open the luggage.

## 7. "MARKETING"

The term "marketing" appears in the 537 patent in independent claims 1,9,14 and 18 and claims 1 and 10 of the 728 patent. The 537 patent states the following in claim 1: "Marketing the special lock to the consumers in a manner that conveys to the consumers that the special lock will be subjected by the luggage screening entity to the special procedure." With respect to "marketing" the language is identical in claims 9, 14, and 18 and substantially similar to the claim term "marketing" which also appears in the 728 patent.

Travel Sentry argues that neither the 537 nor the 728 patent specifications adequately describe what "marketing the special lock to consumers" means, rendering the term "marketing" indefinite and the claims, therefore, invalid under 35 U.S.C. § 112.[6] (Pl.'s Br. 15). Alternatively, Travel Sentry

---

[6]  Under § 112, a patent's specification must "contain a written description of the invention, and of the manner and process of making it and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art…to make and use the same". 35 U.S.C. § 112 ¶1. The claims of a patent "particularly point[]out and distinctly claim[] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112 ¶2.

proposes that the Court construe the term 'marketing' as "offering for sale or selling" since, "at its core, marketing a product is about offering and selling that product." (Id. 17).

Contrarily, Tropp urges that "marketing" is a common term with a well-understood meaning, and that Travel Sentry's proposed construction limiting "marketing" to sales-related activities in unsupported by the patents' language. Tropp, consistent with this theme, advances a construction of "marketing" as "promoting the sales of the special locks by conveying to consumers that the special lock will be subjected by the luggage/baggage screening entity to a special screening procedure."[7]

To reiterate, claim terms are to be given their ordinary and customary meaning unless it appears from the specification and prosecution history that they were used differently by the inventor. Phillips v. AWH Corp., 415 F.3d. 1303, 1312-13 (Fed. Cir. 2005). In some cases, the ordinary meaning of claim language may be readily apparent even to lay judges and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. Id. However, if the ordinary meaning itself is disputed by the parties, and the meaning of the claim term as understood by persons of skill in the art is not readily apparent, then the Court must determine what claim scope is appropriate for that meaning in the context of the patents-in-suit. O2 Micro Intern. v. Beyond Innovation Tech., 521 F.3d 1351, 1361 (Fed. Cir. 2008). Here, both parties assert that their proffered definition of "marketing" is the understood and customary meaning of that term.

Against this harmonious backdrop, the claims, read in light of the specifications, support a broader reading of the term "marketing" than simply "offering for sale or selling"— the definition espoused by Travel Sentry. Claim 1 in both patents states in relevant part that the invention comprises "[m]arketing the special lock to the consumers in a manner that conveys to the consumers that the

---

[7]   In support of this meaning, Tropp cites Webster's II New College Dictionary, "marketing" is defined as:  1) The act or process of buying and selling in a market. 2) The commercial functions involved in transferring goods from producer to consumer. 3) The act or business of promoting sales of a product, as by advertising or packaging. Webster's II New College Dictionary 686 (3d ed. 2005).

22

special lock will be subjected by the luggage screening entity to the special procedure." This claim addresses promoting the availability of the special lock to allow for a consumer's understanding that an arrangement exists where the lock would be subject to a special procedure (*i.e.* one that avoids the clipping or other destruction of the lock and/or luggage by the luggage screener). Claim 3, which is dependent to claim 1, states that "a step of making available to consumers a special lock involves selling the special lock directly or indirectly to the consumers."

The specification to the 728 patent states that "[a]s a result of marketing the special lock to consumers or to airline travelers, the indicia conveys to luggage purchasers that the special lock is a lock that the luggage screening authority has agreed not to break". 728 patent, col. 4, ll. 24-28. The background of the invention and discussion of the prior art in both the 537 and 728 patents discuss *inter alia*, the plummeting of sales after TSA began clipping locks, 537 patent, col. 1, ll. 62-63; 728 patent, col. 2, ll. 9-10, and that the present invention would be valuable to prospective luggage purchasers or lock purchasers since the indicia would convey to luggage purchasers that the special lock is 'approved' by a luggage screening authority,"537 patent, col. 2, ll. 36-38, 728 patent, col. 60-66. Indeed, the focus of the patents is on the system or method or improving airline luggage inspection, not, simply, sale of the lock itself—a conclusion also supported by the patents' prosecution histories. Furthermore, Travel Sentry's own submissions in support of its proposed construction are consistent with a broader reading of "marketing", all of which evidences that the plain and ordinary meaning of "marketing" extends beyond the mere act of "offering for sale or selling."[8]

In short, the patent claims, read in light of the written descriptions, do not support limiting the ordinary meaning of "marketing" to "offering for sale or selling". See, e.g., Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1344-46, 1348 (Fed. Cir. 2001)(crediting the broader interpretation of a claim

---

[8] In any event, even assuming that the Court should consider Travel Sentry's submitted definitions, they are unavailing since they are also consistent with a more expansive interpretation of "marketing" beyond "selling or offering for sale".

term's ordinary meaning when there was no indication in the intrinsic evidence that a more restrictive definition be adopted). Accordingly, the Court construes "marketing" within the context of the patents as "selling or promoting the sale" of the special lock to consumers in a manner that conveys to them that the lock is subject to a special screening procedure.

As might be expected in light of the foregoing, Travel Sentry's invalidity argument founded on the asserted indefiniteness of "marketing" is rejected. The definiteness requirement of § 112 ensures that the claims, as written, provide notice of that patent's scope so that the public can determine whether or not there is a danger of infringing the patent. See All Dental Prodx, Inc. v. Advantage Dental Prods., Inc., 309 F.3d 774, 779 (Fed. Cir. 2002). When a claim cannot be construed, it is indefinite and therefore invalid. Aero Prods. Int'l, Inc. v. Intex Recreation Corp., 466 F.3d 1000, 1016 (Fed. Cir. 2006). This includes instances where the claim language is so inherently standardless that it cannot be meaningfully applied. Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1354 (Fed Cir. 2005). An issued patent is presumed valid, 35 U.S.C. § 282, so the party attacking a claim term on validity grounds must overcome that presumption by clear and convincing evidence. Bancorp Servs., LLC v. Hartford Life Ins. Co., 359 F.3d 1367, 1371 (Fed. Cir. 2004). Even where a construction reached is one which reasonable persons can disagree, that claim is not indefinite. Id. If the claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more. Id. (citing Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 705 (Fed. Cir. 1998).

Here, the claims and specifications sufficiently provide an appropriate understanding of "marketing". As demonstrated above, the claim term "marketing" is not so unamenable to construction that reasonable notice as to the scope of the claim is wanting. As a result, the Court concludes that Travel Sentry fails to meet its burden in proving by clear and convincing evidence that the term "marketing" is indefinite as to render the claim invalid under § 112.

# CONCLUSION

The Court construes the terms as follows:

**Master key** is a key, including electronic or other sensor mechanisms, that can open the master key lock portion or locking mechanisms of the special locks described in the patent.

**Identification structure** is indicia associated with a lock that signals to a luggage or baggage screener that the lock is subject to a special screening procedure.

**Baggage screener** is a person who screens baggage. "Baggage" is a synonym for "luggage". The "screening" covered is any and all screening occurring within the scope of air travel.

**Baggage screening entity** is an entity that screens baggage. "Baggage" is a synonym for "luggage". The "screening" covered is any and all screening occurring within the scope of air travel.

**Making available to consumers a special lock** is causing the special lock to be available to consumers.

**Prior agreement** is a prior arrangement between the luggage screening entity and another party to process special locks in accordance with the special procedure.

**Special procedure** is as a procedure for processing special locks, as recited in the respective claims, in which the screening entity has agreed to act pursuant to a prior agreement to look for the identification structure while screening luggage, and, upon finding that identification structure on an individual piece of luggage, to, use the master key previously provided to the screening entity to, if necessary, open the luggage.

**Marketing** is selling or promoting the sale of the special lock to consumers in a manner that conveys to them that the lock is subject to a special screening procedure.

SO ORDERED.

Dated: Brooklyn, New York
September 24, 2009

ERIC N. VITALIANO
United States District Judge