UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
TRAVEL SENTRY, INC.,                                    :
                                                        :
                    Plaintiff,                          :           **MEMORANDUM AND ORDER**
                                                        :
            - against -                                 :           06-CV-6415 (ENV)(RLM)
                                                        :
DAVID A. TROPP,                                         :
                                                        :
                    Defendant.                          :
------------------------------------------------------------X
DAVID A. TROPP,                                         :
                                                        :
                    Plaintiff,                          :           **MEMORANDUM AND ORDER**
                                                        :
            - against -                                 :           08-CV-4446 (ENV)(RLM)
                                                        :
CONAIR  CORP., et al.,                                  :
                                                        :
                    Defendants.                         :
------------------------------------------------------------X

**VITALIANO, D.J.**

David Tropp ("Tropp") owns two patents that describe a method of airline luggage

screening through the use of a dual-access lock, which enables a traveler to secure his or her

luggage while still permitting it to be accessed by a luggage screening entity with a master key.

Travel Sentry, Inc. ("Travel Sentry") owns a trademark that it licenses to lock and luggage

manufacturers and distributors for use on dual-access luggage locks.  On December 4, 2006,

Travel Sentry filed a complaint against Tropp in this Court seeking a declaratory judgment of

noninfringement, invalidity and non-liability with respect to Tropp's patents; Tropp subsequently

counterclaimed for infringement.  See Case No. 06-cv-6415 (the "Travel Sentry Action").  On

November 3, 2008, Tropp commenced a related action in this Court against more than a dozen

luggage manufacturers and/or distributors which are licensed to use Travel Sentry's trademark

(the "licensee defendants"), claiming infringement of the same patents. <u>See</u> Case No. 08-cv-4446 (the "Licensee Action").[1]

In the Travel Sentry Action, Travel Sentry has moved for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on noninfringement and, in the alternative, invalidity. Meanwhile, in the Licensee Action, the licensee defendants have moved for summary judgment on the ground that, pursuant to 28 U.S.C. § 1498(a), Tropp's patents are exclusively amenable to litigation in an action against the United States in the Court of Federal Claims; further, they recently requested permission from the Court to move for summary judgment on noninfringement as well.

For the reasons that follow, Travel Sentry's motion for summary judgment against Tropp on grounds of noninfringement is granted, and the Travel Sentry Action is dismissed. In light of this disposition, the Court orders Tropp to show cause why he should not be estopped from pursuing his infringement claims against the licensee defendants.

---

[1] Following numerous stipulated corrections to corporate nomenclature, the roster of licensee defendants now stands at 18: Conair Corporation; Brookstone Company, Inc.; Brookstone Stores, Inc.; Briggs & Riley Travelware LLC; Delsey Luggage, Inc.; eBags, Inc.; Eagle Creek, a division of VF Outdoor, Inc.; Master Lock Company, LLC; HP Marketing Corp. Ltd.; L.C. Industries, LLC; Magellan's International Travel Corporation; Outpac Designs, Inc.; Samsonite Corporation; Titan Luggage USA; Travelpro International, Inc.; Tumi, Inc.; TRG Accessories, LLC; and Wordlock, Inc.

A. <u>The Patents</u>

The two Tropp-owned patents at issue are: (1) U.S. Patent No. 7,021,537, filed November 12, 2003, and dated April 4, 2006 ("537 patent"); and (2) U.S. Patent No. 7,036,728, filed November 12, 2004 and dated May 2, 2006 ("728 patent").[3] Both are entitled "Method of Improving Airline Luggage Inspection." The 728 patent claims priority from and is a continuation-in-part of the 537 patent.

The 537 patent contains four independent claims: 1, 9, 14 and 10. The 728 patent contains two independent claims: 1 and 10. Claim 1 of the 537 patent recites:

> A method of improving airline luggage inspection by a luggage screening entity, comprising:
>
> making available to consumers a special lock having a combination lock portion and a master key lock portion, the master key lock portion for receiving a master key that can open the master key lock portion of this special lock, the special lock designed to be applied to an individual piece of airline luggage, the special lock also having an identification structure associated therewith that matches an identification structure previously provided to the luggage screening entity, which special lock the luggage screening entity has agreed to process in accordance with a special procedure,

---

[2] Except where otherwise noted, the facts set forth in this opinion are admitted by the parties. Travel Sentry's statement of undisputed material facts pursuant to Local Rule 56.1, submitted in conjunction with both of its pending motions for summary judgment in the Travel Sentry Action, is referenced as "TS 56.1 ¶ __"; Tropp's Rule 56.1 Statement submitted in opposition to Travel Sentry's motions is referenced as "Tropp 56.1 ¶ __"; and Travel Sentry's Reply to Tropp's Rule 56.1 Statement is referenced as "TS Reply 56.1 ¶ __". In order to extricate the facts relevant to the Court's summary judgment inquiry from this panoply of statements, the Court applies the following principles: (1) any fact alleged in a moving party's Rule 56.1 statement, supported in fact by the record, and not specifically and expressly contradicted by properly supported allegations in the nonmoving party's Rule 56.1 statement, is deemed admitted by the nonmoving party; (2) any fact alleged in a moving party's Rule 56.1 statement, supported in fact by the record, which is specifically and expressly controverted by allegations in the nonmoving party's Rule 56.1 statement that are properly supported in fact by the record, is not deemed admitted by the nonmoving party; (3) any fact alleged in a moving party's Rule 56.1 statement that is not supported by citations to admissible evidence in the record is not deemed admitted by the nonmoving party; and (4) any party's assertion of a legal conclusion in the guise of an undisputed statement of fact is disregarded. <u>See</u> E.D.N.Y. Local Rule 56.1(b), (e); <u>Wojcik v. 42nd St. Dev. Project, Inc.</u>, 386 F. Supp. 2d 442, 448 & n.5 (S.D.N.Y. 2005).

[3] Familiarity with the Court's September 24, 2009 <u>Markman</u> decision, construing the claims of the 537 and 728 patents, is presumed. <u>See</u> <u>Travel Sentry, Inc. v. Tropp</u>, 661 F. Supp. 2d 280 (E.D.N.Y. 2009).

marketing the special lock to the consumers in a manner that conveys to the consumers that the special lock will be subjected by the luggage screening entity to the special procedure,

the identification structure signaling to a luggage screener of the luggage screening entity who is screening luggage that the luggage screening entity has agreed to subject the special lock associated with the identification structure to the special procedure and that the luggage screening entity has a master key that opens the special lock, and

the luggage screening entity acting pursuant to a prior agreement to look for the identification structure while screening luggage and, upon finding said identification structure on an individual piece of luggage, to use the master key previously provided to the luggage screening entity to, if necessary, open the individual piece of luggage.

The parties agree that this claim is representative of the independent claims of both patents.[4]

B. <u>Relevant History of the Parties</u>

1. *TSA*

The Transportation Security Administration ("TSA"), which is part of the United States Department of Homeland Security ("DHS"), controls airline luggage inspection and is the sole luggage screening entity in the United States. The TSA specifies all inspection procedures and exclusively bears the responsibility of deciding if, when and how any airline luggage is opened or inspected in this country. (TS 56.1 ¶ 12.) It is undisputed that, in the United States, the "luggage screening entity" recited in the 537 and 728 patents is the TSA.

---

[4] Claim 9 of the 537 patent is identical to claim 1 except for substitution of the phrase "having a combination lock portion" with "having a first lock portion." Claims 14 and 18 of the 537 patent mirror claims 1 and 9, but substitute the phrase "matches an identification structure" with "corresponds with a corresponding identification structure." Claims 1 and 10 of the 728 patent also mirror claims 1 and 9 of the 537 Patent, but: (a) substitute the word "luggage" with "baggage;" (b) substitute the phrase "matches an identification structure" with "matches a corresponding identification structure;" and (c) substitute the phrase "the master key previously provided to" with "the special procedure previously agreed to by."

On December 19, 2002 the TSA publicly announced that, as of January 1, 2003, it would begin screening 100% of checked airline luggage for flights originating in the United States, pursuant to a Congressional mandate ("Screening Mandate") instituted in response to the 9/11 terrorist attacks. (TS 56.1 ¶¶ 11, 37.)

## 2. *Travel Sentry*

John Vermilye ("Vermilye") is the founder and Chief Executive Officer of Travel Sentry. Vermilye began his career in the airline industry in 1972, working as an Air France baggage loader at Logan Airport in Boston, Massachusetts. Early on, Vermilye learned that United States Customs officers were tasked with opening and inspecting unclaimed luggage, and that, to facilitate their work, luggage lock master keys for the most commonly used luggage brands were collected on large key rings and used to open unclaimed luggage whenever possible. Between 1974 and 1980, Vermilye held various other positions at Logan, working as a ticket agent and in the airport control center. In 1980, he moved to a position in management at Eastern Airlines. During his eight years at Eastern, Vermilye gained more knowledge about and experience with security protocols, serving as the head of corporate baggage operations and chairing an international task force that developed baggage security procedures. Among other things, Vermilye was responsible for Eastern's Central Baggage Tracing ("CBT") facility at Miami Airport, where all of the unclaimed luggage from Eastern's network was collected and opened by airline staff; CBT personnel, much like the Customs officers at Logan with whom Vermilye had worked, attempted to access bags and identify their owners by using previously assembled sets of master luggage keys. (TS 56.1 ¶¶ 6, 7. 9, 10.)

In 1988, Vermilye became the manager of baggage operations for the International Air Transport Association in Geneva, Switzerland, where he wrote the standards for baggage

handling for all airlines.  (TS 56.1 ¶ 8.)  In 2002, he was hired as a consultant by the TSA, where he provided assistance with, among other things, implementation of the Screening Mandate.  At the TSA, Vermilye recognized that the agency faced significant challenges in attempting to comply with the Screening Mandate, in light of, among other things, the agency's standard practice and policy of breaking locks on luggage that required inspection.  He anticipated that, if the lock-breaking approach was not refined or adjusted in the face of the dramatically increased volume of bags to be inspected, injuries suffered by luggage screeners and thefts of passengers' property would likely skyrocket.  (TS 56.1 ¶ 13.)

In September 2002, Vermilye and a team began working on the TSA's customer education program, through which the TSA would inform travelers about its new flight security procedures.  While brainstorming about how to develop the program, Vermilye contacted Stephen Rynn, a business acquaintance and the president of Rynn Luggage, a Baltimore-based luggage seller and servicer, to discuss the feasibility of gathering the most common of the "literally hundreds" of master luggage keys in circulation in order to streamline the opening of locked bags.  (TS 56.1 ¶ 16.)  Vermilye and Rynn both thought that about 80% of luggage locks could be opened with a relatively small number of master keys, and that a luggage screener's odds of locating the right master key to open a given lock were much higher when the screener could identify the lock's manufacturer by visual indicia such as a brand logo or alphanumeric code.  (TS 56.1 ¶ 17; TS Reply 56.1 ¶ 17.)

Approximately two months later, Vermilye was formally assigned to assist the TSA with implementing its comprehensive baggage screening policy pursuant to the Screening Mandate.  After he persuaded some higher-ups at the TSA that it would be worthwhile to collect a subset of master keys on a ring for screeners to use, Vermilye was tasked with "coordinat[ing]

procurement plans for key sets." He contacted Rynn again in connection with the TSA key ring project in late November 2002, and met with him to inquire if Rynn was interested in being retained as a TSA contractor, to gather sets of commonly used luggage keys from manufacturers and assemble rings for TSA use at commercial airports in the United States. (TS 56.1 ¶¶ 18, 19; TS Reply 56.1 ¶ 18.) Rynn was amenable, and Rynn Luggage subsequently contracted to supply the TSA with approximately 1500 key rings ("TSA-Rynn Rings") prior to the Screening Mandate deadline of January 1, 2003. Rynn collected a set of about 35 master keys for each TSA-Rynn Ring, which Rynn and TSA staff estimated could open about 80% of baggage with integrated key locks. (TS 56.1 ¶¶ 20, 23; TS Reply 56.1 ¶ 20.) In December 2003, the TSA prepared instructions and guides for baggage screeners about making efforts to open locked bags with the keys on the TSA-Rynn Rings. (TS 56.1 ¶¶ 21, 22; TS Reply 56.1 ¶¶ 21, 22.)

The TSA-Rynn Ring project was in place by early January 2003, according to plan. However, Vermilye and others at the TSA viewed it as only a temporary solution to the formidable challenge posed by the Screening Mandate. The record reflects that, as of late November and December 2002, Vermilye had started to mull over and speak to others about the "Travel Sentry concept," which the parties agree "is a lock standard that enables the traveling public to lock their checked baggage during travel while still allowing the TSA to open the lock and search the bags as needed, and then re-lock them."[5] (TS 56.1 ¶ 2.) According to Rynn, Vermilye told him at their meeting in November 2002 that Vermilye "was in the process of developing a system that would allow the opening of baggage locks with a universal master key held by the TSA." (TS 56.1 ¶ 26; TS Reply 56.1 ¶ 26.) Similarly, Vermilye's supervisor at the TSA, Kurt Krause, recalls that during the period in which the TSA-Rynn Rings were being

---

[5] While Tropp argues that the Travel Sentry concept was not an original idea for which Vermilye can take credit, the unrefuted record evidence nonetheless demonstrates that Vermilye was thinking about the concept in late 2002.

assembled, in late November and December 2002, Krause, Vermilye and other TSA employees talked about how it would "be great if there was one lock that the consumer used, or two or three locks, to reduce that ring from 50 [keys] to one key that the Government would have, that we would trust the Government to have that key and nobody else;" however, they also agreed that it would be impossible to get such a project approved and implemented in the time frame required by the Screening Mandate.  (TS 56.1 ¶ 25; TS Reply 56.1 ¶ 25.)

On or about January 10, 2003, Vermilye and Rynn met for a debriefing on the inception of the TSA's use of the TSA-Rynn Rings.  According to Rynn, they also talked more about Vermilye's "Travel Sentry concept"; specifically, they discussed the prospect of a standard dual access lock, identifiable by a standardized indicia or logo, that would reduce the number of keys that screeners had to carry, and Vermilye told Rynn that he was considering simply licensing the concept rather than manufacturing or selling the locks himself.  (TS 56.1 ¶ 28; TS Reply 56.1 ¶ 28.)  On January 14, 2003, Vermilye went to see a patent attorney, Alicia Meros, for advice about how to protect the Travel Sentry concept as intellectual property, and asked her to perform a patent search on luggage locks.  Within days of his meeting with Meros, at her suggestion, Vermilye wrote down descriptions of what the Travel Sentry concept was and when he had thought of it.  (TS 56.1 ¶ 27; TS Reply 56.1 ¶ 27.)

Vermilye formally left the TSA on March 7, 2003, and devoted himself to pursuing the Travel Sentry concept.  On March 27, 2003, Vermilye presented it at the Travel Goods Association ("TGA") convention in Las Vegas, Nevada.  In his presentation materials, Vermilye envisioned that Travel Sentry's mark could be used on any manufacturer's luggage or lock instead of or in addition to the manufacturer's own mark, that the TSA would be willing to train its screeners to use a particular master key on locks demarcated by a Travel Sentry logo or mark,

and that manufacturers could market locks and luggage to consumers on the basis that the TSA would recognize their locks and not break them. (TS 56.1 ¶ 30.)

Following the TGA convention, between March and August 2003, Vermilye met with luggage manufacturers and retailers in the United States and abroad to propose his system. By early August 2003, Vermilye had arranged for the creation of lock prototypes, and also claims to have received verbal assurances from the TSA that it would work with him to make the Travel Sentry concept a reality. (TS 56.1 ¶¶ 32-34; TS Reply 56.1 ¶¶ 32-34.) On August 20, 2003, the <u>Wall Street Journal</u> published an article entitled "Travel Watch: Making Up for the Blackout – Luggage Lockup," describing the Travel Sentry concept. On October 16, 2003, a "Memorandum of Understanding/ Agreement Between the Transportation Security Administration and Travel Sentry Regarding Travel Sentry Certified Locks" ("MOU") was signed.

The MOU, which took effect on November 5, 2003, is the only written agreement between the TSA and Travel Sentry concerning Travel Sentry marked locks. The MOU states that the purpose of the agreement:

> is to set forth terms by which Travel Sentry will provide TSA, at no cost, with 1,500 complete sets of passkeys for the TSA to distribute to field locations. These passkeys are designed to permit TSA screeners to open checked baggage secured with Travel Sentry certified locks without breaking such locks.
>
> TSA will test these passkeys to ensure their operational suitability. If TSA determines that Travel Sentry certified locks or the passkeys required for their operation do not perform their intended function, TSA will inform Travel Sentry and this agreement will be considered null and void. TSA takes no responsibility for any damage to locks or baggage secured with Travel Sentry locks, although TSA will make good faith efforts to distribute the passkeys and information provided by Travel Sentry on the use of the passkeys, and to use the passkeys to open checked baggage secured with Travel Sentry certified locks whenever practicable. TSA screeners will make good faith efforts to relock Travel Sentry locks after bags are inspected.

The MOU specifically enumerates the responsibilities of each party under the agreement. With respect to the TSA, the agreement provides that:

(a) TSA will accept passkey sets, as well as backup replacement sets, from Travel Sentry and distribute the sets to all areas where baggage is being screened;

(b) the passkeys will be stamped "Property of TSA" and "Unlawful to Duplicate," "may include the DHS logo if desired and authorized," and will be marked with a tracking number in a TSA-agreed format so that they "can be easily integrated into the TSA property management system;"

(c) Travel Sentry will coordinate the content of public announcement with the TSA in advance of the program launch, tentatively scheduled for November 12, 2003, "including promotional materials, press releases and similar media;" and

(d) "TSA may offer the same terms and conditions in this agreement to any other entity that seeks to provide similar services."

With respect to Travel Sentry's responsibilities, the MOU provides that:

(a) "Travel Sentry acknowledges that the TSA cannot make or infer any exclusive endorsement of Travel Sentry certified locks, nor can Travel Sentry claim that any such endorsement exists. Travel Sentry may not use the DHS/TSA logo on any of its locks or distributed print or other media materials unless specifically authorized to do so in writing;"

(b) "Travel Sentry understands that the TSA intends to develop a functional standard, open to the public, for 'Independent Dual Custody Operation Locking Systems.' By moving ahead with its program in advance of the publication and adoption of this standard, Travel Sentry or any other entity takes some degree of risk in that their locking system may not meet the final version of the functional standard;" and

(c) "Travel Sentry will provide TSA with all necessary screener training materials, in sufficient quantities, on lock recognition, use of passkeys to open locks and ordering of replacement or additional sets of passkeys. Travel Sentry will work with TSA in ensuring distribution of training materials to all checked baggage screening sites."

Under "Other Provisions," the MOU again references the intent of the TSA to develop a publicly-issued standard for dual access locks, and notes that the "TSA also intends to provide

the standard to third parties for independent testing and evaluation. Vendors wishing to have their locks evaluated against the standard will be expected to deal directly with the 3rd party evaluator." Finally, the MOU provides that its terms will remain in effect until terminated, that either party can terminate it upon 30 days notice to the other, and that, in the event that the TSA no longer needs the passkeys, it will dispose of them in a manner agreed to in writing by both parties.

By mid-November 2003, around the MOU's effective date, locks bearing Travel Sentry's logo – a red diamond – were finally made available to retail consumers, and hundreds of TSA-operated airports around the country had been supplied with master keys and tools to open Travel Sentry-marked locks. (TS 56.1 ¶¶ 35-37; TS Reply 56.1 ¶¶ 35-37.)

Travel Sentry holds the trademark, and under the terms of its Trademark License Agreement, certain lock manufacturers pay Travel Sentry an initial flat fee and then royalties for each lock bearing the mark that they sell to a distributor, as well as an annual fee and a fee for the master keys per assigned lock cylinder. Under the terms of Travel Sentry's Marketing License Agreement, certain lock distributors pay Travel Sentry an annual fee for the right to market a capped number of marked locks, and under the Limited Distribution Letter of Agreement, certain luggage manufacturers pay Travel Sentry an annual fee and royalties for each marked lock used in their luggage. Travel Sentry's website provides an explanation to consumers about how the concept works and identifies both online sites and brick-and-mortar establishments where Travel Sentry-marked products can be purchased. (TS 56.1 ¶¶ 79-81, 86; Tropp 56.1 ¶¶ 79-81, 86; TS Reply 56.1 ¶¶ 79-81, 86.) Travel Sentry retains rights to monitor the quality of the locks which bear its mark and controls the distribution of master keys, which have a distinctive shape and design.

3. *Tropp*

In December 2002, Tropp was self-employed by his company HD Services, in the business of recovering abandoned property on a commission basis. According to Tropp, he read a news article about the Screening Mandate on the day that it was issued, December 19, 2002, and immediately conceived of his method for improving airline luggage inspection, at which point he wrote the idea down and drew rough sketches of the locks on two pages in his "invention journal." On January 13, 2003, Tropp sent an "Unsolicited Proposal" to the TSA, proposing an agreement by which he would exclusively provide a luggage master key to the TSA to use in its screening process. The TSA wrote back to Tropp on February 13, 2003, informing him that the proposal would be taken under consideration. About a month later, Tropp sent a follow-up email to the TSA regarding his Unsolicited Proposal, and on March 28, 2003, he received a response indicating that it did not meet the TSA lock standards then in effect. (TS 56.1 ¶¶ 39, 41-44.)

Tropp's activities in the spring and summer of 2003 with respect to his lock idea are hotly disputed. At one deposition, Tropp indicated that, between March and August 2003, he did not take steps to develop his idea further. However, at his next deposition, Tropp testified that during that period, he made several attempts to reach the TSA by telephone, spoke with a potential partner about building a business around his idea, met with a former Small Business Administration executive, and ran online searches on lock manufacturers, air travel volume and government contracting. Tropp contends that the latter testimony did not contradict his initial statement, but rather, supplemented and clarified it. (TS 56.1 ¶¶ 45-46; Tropp 56.1 ¶¶ 45-46.)

Tropp read the August 20, 2003 Wall Street Journal article describing the Travel Sentry system. Soon afterward, Tropp retained a patent attorney to conduct a patent search, although he

maintains that this was not motivated by the article. (TS 56.1 ¶ 49; Tropp 56.1 ¶ 49.) He met

with another patent attorney in October 2003, and retained that attorney to assist him with

applying for a patent for the lock system. Tropp's first patent application for his "method of

improving airline luggage inspection" was filed on November 12, 2003. Shortly after that, the

TSA notified Tropp that it would recognize his system. (TS 56.1 ¶¶ 50-52.) Tropp later

incorporated another company, Safe Skies, LLC, which began selling locks termed "Liberty

Locks," identified by a red-flame logo, to the public in 2005.[6] Safe Skies sells its Liberty Locks

online, by mail order and to large retailers. (TS 56.1 ¶ 53; Tropp 56.1 ¶ 53.)

## DISCUSSION

### I. Summary Judgment Standard

As in any other type of case, a grant of summary judgment under Rule 56 of the Federal

Rules of Civil Procedure is appropriate in a patent case where no genuine issue of material fact

exists and the movant is entitled to judgment as a matter of law. See Barmag Barmer

Maschinenfabrik AG v. Murata Mach., Ltd., 731 F.2d 831 (Fed. Cir. 1984) (summary judgment

on issue of validity); Townsend Eng'g Co. v. HiTec Co., 829 F.2d 1086, 1089 (Fed. Cir. 1987)

(summary judgment on issue of infringement). Summary judgment may be granted in favor of a

moving party on an ultimate issue of fact where the party carries its burden of "pointing out to

the district court that there is an absence of evidence to support the nonmoving party's case."

Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2553 (1986). As further stated in

Celotex, when "a party [ ] fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial

. . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof

---

[6] Travel Sentry represents, and Tropp does not deny, that Tropp has entered into an agreement with the TSA that is
essentially identical to the MOU between Travel Sentry and the TSA.

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  477 U.S. at 322-23, 106 S. Ct. at 2552.

"When deciding issues in a patent case, a district court applies the law of the circuit in which it sits to nonpatent issues and the law of the Federal Circuit to issues of substantive patent law."  In re Omeprazole Patent Litig., 490 F. Supp. 2d 381, 399 (S.D.N .Y. 2007) (citing Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1378-79 (Fed. Cir. 2005)); see, e.g., Desenberg v. Google, Inc., No. 09-cv-10121, 2009 WL 2337122, at *5 (S.D.N.Y. July 30, 2009).

## II. **Noninfringement**

### A.  Standard

Summary judgment on the ground of noninfringement of a patent may be granted where the patentee's proof is deficient in meeting an essential part of the legal standard for infringement liability.  See Johnston v. IVAC Corp., 885 F.2d 1574, 1577 (Fed. Cir. 1989); Townsend Eng'g, 829 F.2d at 1089.

The Patent Act provides that "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof may obtain a patent therefore, subject to the conditions and requirements of this title."  35 U.S.C. § 101; see also Diamond v. Chakrabarty, 447 U.S. 303, 309, 100 S. Ct. 2204, 2207-2208 (1980) (Congress intended § 101 to include "anything under the sun that is made by man.").  Three of the four classes of patentable inventions – machines, manufactures, and compositions of matter – may be grouped into "products," leaving "products" and "processes" as the two general categories of patents.  See 1 Donald. S. Chisum, Patents, § 1.01, at 1-5, 1-7 (1996).  The 537 and 728 patents fall into the latter category.[7]  Generally speaking, there are two theories under which

---

[7] A "process" is further defined by the Patent Act as a "process, art or method."  35 U.S.C. § 100(b).  By their clear terms, the 537 and 728 patent claims claim a method ("Method of Improving Airline Luggage Inspection").  Thus,

a defendant may be held liable for infringement of a patented process: (1) direct infringement, where the defendant (a) itself allegedly performs all of the steps of the process, or (b) controls or directs the actions of multiple third parties which combine to perform all of the steps of the process; and (2) indirect infringement, where the defendant actively induces or contributes to direct infringement by a third party. Travel Sentry argues that there is insufficient evidence in the record to support a finding of infringement under either theory.

1. *Direct Infringement*

Title 35 U.S.C. § 271(a) provides that: "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefore, infringes the patent." A violation of § 271(a) constitutes "direct infringement."

"To establish [direct] infringement of a patent, every limitation set forth in a claim must be found in an accused product or process." IVAC, 885 F.2d at 1577. If a limitation is not found in a literal sense, or "exactly," the patent may still be infringed if the accused product or process contains the limitation's "substantial equivalent." Id. "Infringement under the doctrine of equivalents 'does not require complete identity for every purpose and in every respect,' but does require substantial identity of function, means, and result." Lear Siegler, Inc. v. Sealy Mattress Co. of Mich., 873 F.2d 1422, 1425 (Fed. Cir. 1989) (quoting Graver Tank and Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 609, 70 S. Ct. 854, 856 (1950)).

Crucially, Federal Circuit "precedents draw a clear distinction between method and apparatus claims for purposes of infringement liability." Cardiac Pacemakers, Inc. v. St. Jude Med., Inc., 576 F.3d 1348, 1363 (Fed. Cir. 2009). "Under section 271(a), the concept of 'use' of a patented method or process is fundamentally different from the use of a patented system or

they fall into the "process" category.

device . . . . A method or process consists of one or more operative steps, and, accordingly, '[i]t is well established that a patent for a method or process is not infringed unless all steps or stages of the claimed process are utilized.'  Because a process is nothing more than the sequence of actions of which it is comprised, the use of a process necessarily involves doing or performing each of the steps recited."  <u>NTP, Inc. v. Research In Motion, Ltd.</u>, 418 F.3d 1282, 1317-18 (Fed. Cir. 2005) (quoting <u>Roberts Dairy Co. v. United States</u>, 530 F.2d 1342, 1354 (Ct. Cl. 1976)).

Customarily, "direct infringement requires a single party to perform every step of a claimed method."  <u>Muniauction, Inc. v. Thomson Corp.</u>, 532 F.3d 1318, 1329 (Fed. Cir. 2008); <u>see</u> <u>BMC Res., Inc. v. Paymentech, L.P.</u>, 498 F.3d 1373, 1378 (Fed. Cir. 2007) ("Direct infringement requires <u>a party</u> to perform or use <u>each and every step</u> or element <u>of a claimed method</u> or product." (emphasis added)).  However, in <u>BMC Resources</u>, the Federal Circuit clarified that "where the actions of multiple parties combine to perform every step of a claimed method," those parties may be held jointly liable for direct infringement in the event that "one party exercises 'control or direction' over the entire process such that every step is attributable to the controlling party, <u>i.e.</u>, the 'mastermind.'"  <u>Id.</u> at 1380-81.  "At the other end of this multi-party spectrum, mere 'arms-length cooperation' [between multiple parties to perform the steps of a claimed method] will not give rise to direct infringement by any party."  <u>Muniauction</u>, 532 F.3d at 1329 (quoting <u>BMC Res.</u>, 498 F.3d at 1371); <u>see, e.g.</u>, <u>Golden Hour Date Sys., Inc. v. emsCharts, Inc.</u>, Nos. 2009-1306, 2009-1396, 2010 WL 3133539, at *3, *13 (Fed. Cir. Aug. 9, 2010) (affirming district court's grant of judgment as a matter of law in favor of accused joint infringers which had collaborated to perform all of the steps of the claimed method, noting that the "two companies formed a strategic partnership, enabled their two programs to work together,

and collaborated to sell the two programs as a unit" but "the evidence [ ] was insufficient for [a] jury to infer control or direction").

In <u>Muniauction</u>, the Federal Circuit expanded on the "mastermind theory" set forth in <u>BMC Resources</u>, stating that "the control or direction standard is satisfied in situations where the law would traditionally hold the accused direct infringer vicariously liable for the acts committed by another party that are required to complete performance of a claimed method." <u>Muniauction</u>, 532 F.3d at 1329. Specifically, <u>Muniauction</u> – in which the patent at issue claimed an electronic method allowing municipal bond issuers to initiate and monitor bond auctions, and bidders to prepare, submit, and monitor bids – held that the fact that an alleged infringer merely "controls access to its system and instructs bidders on its use is not sufficient to incur liability for direct infringement." <u>Id.</u> at 1330. Examining and applying the holdings of <u>BMC Resources</u> and <u>Muniauction</u>, one district court held (in a decision later affirmed without discussion by the Federal Circuit), that "the third party must perform the steps of the patented process by virtue of a <u>contractual obligation or other relationship that gives rise to vicarious liability</u> in order for a court to find 'direction or control.'" <u>Global Patent Holdings v. Panthers BRHC LLC</u>, 586 F. Supp. 2d 1331, 1335 (S.D. Fla. 2008) (emphasis added) (dismissing direct infringement claim because the defendant had no contractual relationship with the third parties who performed a step of the patented process, the third parties were not alleged to be the defendant's agents, and the plaintiff failed to allege "any fact which would render [d]efendant otherwise vicariously liable for the acts of [the third parties]"), <u>aff'd</u>, 318 F. App'x 908 (Fed. Cir. 2009) (per curiam).

2. *Indirect Infringement*

In addition to its prohibition on direct infringement, 35 U.S.C. § 271 also provides, *inter alia*, that:

(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

(c) Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

Violation of either of these subsections constitutes "indirect infringement." A claim for "[i]ndirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement, though the direct infringer is typically someone other than the defendant accused of indirect infringement." Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263, 1272 (Fed. Cir. 2004) (citing, e.g., Jansen v. Rexall Sundown, Inc., 342 F.3d 1329, 1334 (Fed. Cir 2003) (defendant vendor accused of indirect infringement based upon allegations that its customers directly infringed plaintiff's patent)).

B. The Parties' Noninfringement Arguments

1. *Travel Sentry*

The 537 and 728 patents undisputedly set forth multiple "steps" of the claimed method, as all method patents do. However, the number of steps is disputed. According to Travel Sentry, there are four steps, summarized as follows:

(1) Making available to consumers a special lock designed to be used on luggage, which special lock the TSA has agreed to process in accordance with a special procedure;

(2) Marketing the special lock to the consumers in a way that informs them that the special lock will be subjected by the TSA to the special procedure;

(3) The identification structure on the special lock signaling to the baggage screener that the TSA has agreed to subject the special lock to the special procedure; and

(4) The TSA acting pursuant to a prior agreement to look for the identification structure while screening baggage and, upon finding it, to use the special procedure to, if necessary, open the lock.

Travel Sentry's reading tracks the justification and spacing of the printed text of each independent claim of the 537 and 728 patents; each independent claim states "a method . . . , comprising:" followed by four paragraphs, demarcated by indentations, which correspond to Travel Sentry's four identified steps.

Travel Sentry's legal arguments boil down to these points: (a) Travel Sentry does not directly infringe because it does not perform any of the steps of the claimed method, much less all of them, either literally or equivalently; (b) Travel Sentry does not directly infringe because, to the extent that the actions of multiple third parties (i.e., its licensees and/or the TSA) combine to perform every step of the claimed method, Travel Sentry does not "mastermind" the conduct of those third parties; and (c) Travel Sentry does not indirectly infringe because no other third party unilaterally performs each and every step of the claimed method or masterminds others who do, and there can be no indirect infringement without direct infringement.

Travel Sentry argues that it does not perform step 1 because the TSA has not "agreed to process" Travel Sentry-marked locks "in accordance with a special procedure," noting that the MOU does not specify or obligate the TSA to follow any particular screening procedure, but merely asserts that the TSA will give a good faith effort to use the Travel Sentry master keys to open Travel Sentry locks. In fact, Travel Sentry argues, the TSA's procedures and methodologies are classified as sensitive security information ("SSI") under 49 C.F.R. 1520,[8] and thus cannot even be disclosed to a third party such as Travel Sentry without specific written authorization, of which there is no evidence here. Further, even if the TSA had agreed to use a

---

[8] The regulation defines SSI as including, among other things, "specific details of aviation, maritime or rail transportation security measures." 49 C.F.R. 1520.5(b)(8).

special procedure for opening Travel Sentry-marked locks, Travel Sentry asserts that it does not make such locks "available to consumers," but merely licenses its trademark to retailers and manufacturers, and neither manufactures, sells, offers for sale, gives away or distributes locks nor controls or directs its licensees regarding if, when or where to sell or distribute locks.

Similarly, with respect to step 2, Travel Sentry argues that it does not know or purport to know whether a Travel Sentry-marked lock will be subjected by the TSA to any special opening procedure, and, in any event, all marketing of Travel Sentry-locked marks to consumers is accomplished by its licensees without control or direction on Travel Sentry's part. With respect to steps 3 and 4, Travel Sentry argues that these steps, if performed by anyone, must be performed by the TSA, who Travel Sentry does not direct or control. Further, Travel Sentry states that there is no reasonable basis to conclude that the TSA does perform these steps, as there is no evidence in the record regarding what, if anything, the Travel Sentry mark signals to any given TSA baggage screener or what specific actions a screener takes when opening a given piece of checked luggage, there is no "prior agreement" by the TSA to look for the Travel Sentry mark while screening baggage, and there is no "special procedure" that the TSA has agreed to use for the opening of Travel Sentry-marked locks.

2. *Tropp*

According to Tropp, the claimed method is comprised of two steps. Like Travel Sentry, Tropp defines the first step as corresponding to the first paragraph of each independent claim, but Tropp collapses Travel Sentry's second, third and fourth steps (i.e., the second, third and fourth paragraphs of each independent claim) into a single step/paragraph:

> (1) Making available to consumers a special lock . . . ; and
>
> (2) Marketing the special lock to the consumers in a way that informs them that the special lock will be subjected by the TSA to the special procedure.

Tropp characterizes the MOU as a "specific prior agreement" by the TSA to employ the "special procedure" of opening Travel Sentry-marked locks with Travel Sentry-provided master keys. He notes that Travel Sentry-marked locks cannot be manufactured or distributed ("made available") without the specific agreement and authorization of Travel Sentry and observes that, through its various contracts with licensees, Travel Sentry limits the products on which its trademark can be used, exerts complete control over quality and samples, and solely controls the creation, duplication and provision of master keys to the TSA. Further, Tropp contends that Travel Sentry itself "promotes" the locks to consumers because its own marketing materials and website explain the TSA's "special procedure" and its website identifies outlets for purchase of Travel Sentry marked products, and points out that Travel Sentry retains authority in its license agreements to approve all advertising, promotional and marketing materials about Travel Sentry-marked locks. Finally, to the extent that any step or part of a step of his claimed method must be performed by a "screening entity," Tropp argues that there is a genuine question of material fact as to whether, in all substantive aspects, Travel Sentry enables and controls the TSA in its performance of those aspects of the method.

Based on this reasoning, Tropp argues that there is sufficient evidence to raise genuine issues of material fact regarding whether Travel Sentry "makes available" and/or "markets" dual-access special locks to consumers in the manner claimed in his patents, whether it induces any of its licensees to perform each of those steps, and whether it directs or controls the activities of third parties – its licensees and the TSA – who together perform all the steps of the patented method, and accordingly, summary judgment of noninfringement is inappropriate.

C. Declaration of Noninfringement

As an initial matter, the Court addresses the disagreement regarding the steps defined in Tropp's patented process. Although this was not previously raised as a disputed point at the claim construction stage of the proceedings, it is nevertheless a claim construction issue within the Court's bailiwick. See generally Markman v. Westview Inst., Inc., 517 U.S. 370, 376-78, 116 S. Ct. 1384, 1389-90 (1996); Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). The Court's role in performing claim interpretation is not limited to defining isolated words or phrases, but extends to determinations regarding the overall scope and nature of the claimed process. See, e.g., Leighton Techs. LLC v. Oberthur Card Sys., S.A., 358 F. Supp. 2d 361, 366 (S.D.N.Y. 2005) (noting that, for process claims, claim interpretation may involve ascertaining whether the steps must be performed in a specific order) (citing Altiris, Inc. v. Symantec Corp., 318 F.3d 1363, 1369-70 (Fed. Cir. 2003). And, quite obviously, both sides believe that this particular determination is pivotal since, so long as at least one step of the method is performed entirely by the TSA, Travel Sentry cannot possibly directly infringe by performing all of the steps of the method. Also, it cannot directly infringe on a "mastermind" theory unless it controls the TSA's performance of its step. "When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." O2 Micro. Intern. Ltd. v. Beyond Innovation Tech., Co., 521 F.3d 1351, 1362 (Fed. Cir. 2008).

While claim construction begins with the claims themselves, which "provide substantial guidance as to the meaning of particular claim terms," the claim terms must further be considered in the context of the patent as a whole, including the specification. See Phillips, 415 F.3d at 1312-13 (citing Vitronics Corp. v. Conceptronics, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)), 1315. The plain, ordinary and contextually reasonable meanings of claim terms are

presumed to have been intended, unless an inventor has clearly and deliberately assigned different meanings elsewhere in the patent or in the prosecution history. <u>See</u> <u>Phillips</u> at 1316; <u>ACTV, Inc. v. Walt Disney Co.</u>, 346 F.3d 1082, 1088 (Fed. Cir. 2003). The ordinary meaning of a "step" in this context is "a stage in a gradual, regular or orderly process," or "an action, process, or measure often occurring as one in a series." <u>Merriam-Webster's Third New Int'l Dictionary of the English Language</u> 2236 (2002); <u>see also Leighton Techs. LLC v. Oberthur Card Sys., S.A.</u>, 358 F. Supp. 2d 361, 377 (S.D.N.Y. 2005) (noting that "step" is a "plain English, utterly non-technical" word and construing it to mean "a stage in a process," based on Webster's New Collegiate Dictionary, for the purpose of construing claims in process patent).

Notably, although the parties both interpret the independent claims in the 537 and 728 patents as setting forth multiple steps of a process, the claims themselves do not mention "steps" at all. They simply state that the claimed method is "comprised of" elements described in four separate and discrete (albeit unnumbered or unlettered) paragraphs. The ordinary meaning of "comprise" in this context is "to consist of; be made up of;" or "to include, esp. within a particular scope." <u>Merriam-Webster's Third New Int'l Dictionary of the English Language</u> 467 (2002); <u>see also Leighton Techs.</u>, 358 F. Supp. 2d at 377. The first and second of the four paragraphs, which undisputedly constitute the first and second steps of the method, describe the actions of "making available" and "marketing" locks to customers, without specifying that those actions are to be performed by any particular type of person or entity. The third and fourth paragraphs, which Travel Sentry contends are also "steps" and Tropp contends are not, specifically describe actions to be taken by a luggage screening entity in the course of performing luggage screening (recognizing a signal denoting a special lock, and looking for and opening locks with that signal with a master key). Based on the presentation and substance of

the patent claims (drafted by Tropp himself), the Court finds it obvious that Tropp's claimed method consists of four steps, the last two of which are performed by a screening entity.

The patent specifications are in harmony with this interpretation. Under the heading "Detailed Description of the Preferred Embodiment," the 537 patent states, *inter alia*, "[t]he method of the present invention includes the step of making a special lock available to airline travelers . . . ," and "[T]he method of the present invention also includes the step of providing the luggage screening authority, directly or indirectly, with access to the master key." However, these portions take up only a small part of the description section, which also extensively addresses the power, needs and interests of the TSA, the types of locks that might be employed as part of the method, the benefits and attractiveness of the system to travelers, and so on. Moreover, by stating that the method "includes" certain steps, the description tacitly acknowledges that there may very well be other steps to which it has not called attention, see Merriam-Webster's Third New Int'l Dictionary of the English Language 1143 (2002) (defining "include" as "to place, list or rate as a part of a whole or of a larger group" (emphasis added)), and at the conclusion of the section there is an express and emphatic disclaimer that the description is in no way exhaustive or complete. Further, elsewhere in the 537 patent, 18 "Important Objects and Advantages" are articulated, each one of which spells out a way in which the claimed method will streamline the process and/or ameliorate the negative side effects of baggage screening performed by the TSA. For example, the first "important object and advantage" is "to provide a method of screening luggage at airports that avoids forcible opening of the luggage." Other purported benefits of the proposed method are that it would "reduce[ ] the costs of the luggage screening authority," "reduce[ ] injuries to baggage screeners," "reduce[ ] the liability to the luggage screening authority," "not interfere with current policy of the luggage

screening authority," "decrease[ ] the labor of luggage screeners," "provide[ ] a public relations benefit to the TSA or luggage screening authority," and "allow[ ] the luggage screening authority to get its work done more efficiently."  Not a single one of these important objects and advantages would be realized if the method did not culminate in the final acts of a TSA screener recognizing a special lock and using a master key to open it.

Accordingly, the Court accepts Travel Sentry's interpretation that there are four steps of the claimed method, and the last two must be performed by the TSA.  Tropp does not allege that the TSA (or its equivalent) either "makes available" or "markets" special locks to consumers. Thus, even assuming *arguendo* that Tropp has demonstrated a material question of fact as to whether Travel Sentry performs and/or directs or controls its licensee' performance of each of those two steps, either literally or under the doctrine of equivalents, his direct infringement claim against Travel Sentry is only viable if there is sufficient evidence to permit a reasonable jury to infer that Travel Sentry directs and controls the TSA's performance of the additional steps of the method.  The record provides no such basis.

Although the MOU may arguably be deemed adequate to constitute a "prior agreement" between Travel Sentry and TSA within the meaning of the 537 and 728 patents, it is insufficient to establish the "control or direction" requirement for joint infringement liability established by the Federal Circuit in BMC Resources and Muniauction.  Quite simply, Tropp points to no evidence at all that could morph this relatively noncommittal "understanding" between Travel Sentry and the TSA into a contract that renders Travel Sentry vicariously liable for the TSA's actions.  See Global Patent Holdings, 586 F. Supp. 2d at 1335 (stating that "the third party must perform the steps of the patented process by virtue of a contractual obligation or other relationship that gives rise to vicarious liability in order for a court to find 'direction or

control'"). The MOU reflects that Travel Sentry agreed merely to provide the TSA, *gratis*, with master keys to Travel Sentry certified locks and training guidance on how to identify those locks on checked luggage and, if necessary, open them using the master keys, and that, in return, the TSA merely agreed to test the keys and, if it found them satisfactory, to make a "good faith effort" to use the keys to open bags whenever the TSA found it "practicable" to do so. Under the terms of the MOU, however, the TSA is not subject to any concrete or enforceable obligation to use the master keys at all, and it is expressly absolved of liability for any locks that are damaged during the screening process notwithstanding Travel Sentry certification. The MOU does not provide for any consequences of a failure to comply, and either party can unilaterally terminate it at will. Essentially, all that the MOU proves is that Travel Sentry facilitates the TSA's access to Travel Sentry's lock system (i.e., supplies it with the master keys and provides instructions and guidance to TSA screeners on how to use the system). This is precisely the type of relationship which the Federal Circuit in Muniauction deemed inadequate to support a claim of direct infringement against any party. See Muniauction, 532 F.3d at 1329 (stating that the fact that an alleged infringer merely "controls access to its system and instructs [third parties] on its use is not sufficient to incur liability for direct infringement.").[9]

Therefore, the Court finds that Travel Sentry neither performs all of the steps of Tropp's claimed method itself nor masterminds the performance of all of the steps by others, and consequently cannot be found to directly infringe Tropp's patents. Further, in the absence of a showing that any entity has directly infringed Tropp's patents, any claim by him against Travel

---

[9] The Court's conclusion is buttressed by a decision of the International Trade Commission's Chief Administrative Law Judge in a parallel action brought by Tropp against several foreign luggage manufacturers, which found, *inter alia*, that neither Travel Sentry nor any other entity can be held liable for direct infringement of Tropp's patents, because no single entity performs all of the steps or controls or directs the performance of all of the steps by others. See Certain Dual Access Locks And Products Containing Same, Inv. No. 337-TA-689, USITC (Mar. 18, 2010) (Preliminary). The decision, of course, is not binding here in any way under any theory.

Sentry for indirect infringement fails as a matter of law. Liability for indirect infringement can arise only in the presence of direct infringement. See Dynacore, 363 F.3d at 1272.

## CONCLUSION

For the foregoing reasons, the Court grants summary judgment to Travel Sentry on its claim of noninfringement and dismisses the Travel Sentry Action with prejudice.[10] Notably, 35 U.S.C. § 285 provides that, in infringement actions, "[t]he court in exceptional cases may award reasonable attorneys' fees to the prevailing party." To the extent that Travel Sentry believes in good faith that this is an "exceptional case" and intends to seek recovery of its fees and costs, it shall submit a motion identifying with specificity the "exceptional" circumstances giving rise to its claimed entitlement[11] on or before September 24, 2010, and Tropp shall submit any response on or before October 1, 2010. See Fed. R. Civ. P. 54(d)(2)(C). These submissions shall be limited to addressing the issue of Tropp's liability for fees; if and when such liability is established, the Court will call for submissions regarding the recoverable amount. See Fed. R. Civ. P. 54(d)(2)(C).

Lastly, in light of the Court's finding of noninfringement in the Travel Sentry Action, it appears that Tropp's infringement claims against the licensee defendants in the Licensee Action are barred by collateral estoppel and/or res judicata. Accordingly, on or before September 24,

---

[10] The Court need not and does not decide the merits of Travel Sentry's invalidity claim, or its related motion (which is denied as academic) to strike certain evidence submitted by Tropp in his opposition to summary judgment on invalidity grounds. Invalidity is an affirmative defense to a claim of infringement. See Titan Tire Corp. v. Case New Holland, Inc., 566 F.3d 1372, 1376 (Fed. Cir. 2009). If a court finds that, as a matter of law, an accused product or process does not infringe upon a patent, it is not necessary for the court to consider alternative arguments for summary judgment raised by an allegedly infringing party. See Wing Shing Prods. (BVI) Co. Ltd. v. Sunbeam Prods., Inc., 665 F. Supp. 2d 357, 359-60 (S.D.N.Y. 2009) ("[Defendant] advances four independent grounds for summary judgment: invalidity of the [allegedly infringed] patent; collateral estoppel; non-infringement; and laches . . . . Because the Court finds as a matter of law that the accused devices do not infringe the [ ] patent, it need not address [the] other arguments."), aff'd, No. 2010-1039, 2010 WL 1784720 (Fed. Cir. May 5, 2010).

[11] The Federal Circuit has consistently held that "only a limited universe of circumstances warrant a finding of exceptionality in a patent case: 'inequitable conduct before the PTO; litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful infringement.'" Wedgetail Ltd. v. Huddleston Deluxe, Inc., 576 F.3d 1302, 1304 (Fed. Cir. 2009) (collecting cases) (quoting Epcon Gas Sys., Inc. v. Bauer Compressors, Inc., 279 F.3d 1022, 1034 (Fed. Cir. 2002)).

2010, Tropp is ordered to show cause why the Licensee Action should not be dismissed as a result of this Order, and any reply by any or all licensee defendants shall be submitted on or before October 1, 2010.[12]

        **SO ORDERED.**

DATED:      Brooklyn, New York
              September 10, 2010

                      /s/_____
                      ERIC N. VITALIANO
                      United States District Judge

---

[12] The licensee defendants' August 9, 2010 request for a pre-motion conference or leave to file a motion for summary judgment on noninfringement is denied as premature.